UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GRAND JURY H-21-1

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:22CR110 (VAB) (SDV) |
| v. | VIOLATIONS: |
| [REDACTED], STANISLAV ROMANYUK, VADIMS ANANICS, JANIS UZBALIS, ERIKS MAMONOVS, [REDACTED], CNC WELD, and BY TRADE OU | 18 U.S.C. § 371 (Conspiracy) |
| | 50 U.S.C. § 4819 (Violation of Export Control Reform Act) |
| | 18 U.S.C. § 554 (Smuggling Goods from the United States) |
| | 18 U.S.C. § 1001 (False Statements) |
| | 18 U.S.C. § 2 (Aiding and Abetting, and Causing an Act To Be Done) |
| | 18 U.S.C. § 1956(h) (International Money Laundering Conspiracy) |

SUPERSEDING INDICTMENT

The Grand Jury charges that:

GENERAL ALLEGATIONS

At all times relevant to this Superseding Indictment, the following circumstances pertained:

1

## Background on the Export Control Reform Act of 2018

1. The Export Control Reform Act of 2018 ("ECRA") provides, among its stated policy objectives, that "[t]he national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled . . . ." 50 U.S.C. § 4811(2). To that end, the ECRA grants the President the authority to "control (1) the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and activities. 50 U.S.C. § 4812(a)(1)-(2). The ECRA further grants the Secretary of Commerce the authority to establish the applicable regulatory framework.

2. Pursuant to that authority, the United States Department of Commerce reviews and controls the export of certain items, including commodities, software, and technologies, from the United States to foreign destinations through the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774. In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another.

3. The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at 15 C.F.R. § 774, Supp. No. 1. Items on the CCL are categorized by an Export Control Classification Number ("ECCN"), each of which has export control requirements depending on destination, end use, and end user.

4. It is unlawful for a person to willfully violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under the ECRA. 50 U.S.C. § 4819.

5. The 500 Series CPWZ Precision Jig Grinder (hereinafter "Jig Grinder") was subject to the EAR and classified as ECCN 2B201.c. for nuclear nonproliferation reasons. The Jig Grinder is a high-precision grinding machine system that is controlled by means of a computer, and it is capable of generating a wide variety of ground holes, contours, and surfaces through the combined motion of multiple programmable axes to a position accuracy of 2.5 microns. The Jig Grinder did not require a license for export to Latvia, but it did require a license for export and reexport to Russia, because of the Jig Grinder's potential application in nuclear proliferation and defense programs.

## Export and Shipping Records

6. Pursuant to United States law and regulation, exporters and shippers or freight forwarders were required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those filings were filed electronically through the Automated Export System ("AES") administered by the United States Department of Homeland Security ("DHS"), Customs and Border Protection. A Shipper's Export Declaration ("SED") was an official document submitted to DHS in connection with export shipments from the United States. These forms were used by the United States Bureau of the Census to collect trade statistics and by the United States Department of Commerce, Bureau of Industry and Security ("BIS") for export control purposes.

7.  BIS Form 711 was submitted to the United States Department of Commerce by exporters, shippers, and freight forwarders and required the identification of the end user and end use of goods being exported from the United States. Every BIS Form 711 included a certification, which must be adopted by the exporter, shipper, or freight forwarder who prepared and signed the form, that all of the facts in the BIS Form 711 are true and correct. The BIS Form 711 specifically advised that the provision of false information on the form could result in possible criminal penalties.

8.  A material part of these export filings was information concerning the end user or ultimate destination of the export. The identity of the end user, in addition to other information, was used to determine whether the goods could be exported without any specific authorization from the United States government; whether the goods could be exported with a specific authorization or license from the United States Department of Commerce, the United States Department of State, or the United States Department of Treasury; or whether the goods could not be exported from the United States under any circumstances.

9.  Statements made on these export filings were statements to the United States government that the transaction occurred as described.

### Relevant Individuals, Companies, and Defendants

10. The following individuals, companies, and defendants are relevant to this Superseding Indictment:

   a. the defendant ███████████████████████;

   b. the defendant STANISLAV ROMANYUK is a citizen of Ukraine and a resident of Estonia;

    c. the defendant VADIMS ANANICS is a citizen of Latvia;

    d. the defendant JANIS UZBALIS is a citizen of Latvia;

    e. the defendant ERIKS MAMONOVS is a citizen of Latvia;

    f. the defendant ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮;

    g. the defendant ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is a corporation established in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and under the control of ▮▮▮▮▮▮▮▮;

    h. the defendant CNC WELD is a corporation established in Riga, Latvia, whose Director is MAMONOVS and whose President is ANANICS;

    i. the defendant BY TRADE OU, is an Estonian company established by ROMANYUK, whose nominal director is Individual A, a citizen of Estonia whose identity is known to the Grand Jury;

    j. Company A is a United States corporation with offices in the District of Connecticut, who is known to the Grand Jury and who is not a named defendant, and is the manufacturer and seller of the Jig Grinder; and

    k. Company B is a Russian company with offices in Moscow, who is known to the Grand Jury and who is not a named defendant.

### Licensing Requirements and Status

11.    At no time did ▮▮▮▮▮▮▮▮▮▮▮▮▮, ROMANYUK, ANANICS, UZBALIS, MAMONOVS, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, CNC WELD, or BY TRADE OU apply for, receive, or possess a license or authorization from the United States Department of Commerce to export or reexport the Jig Grinder to Russia.

5

12. Based on CNC WELD's and MAMONOVS's false representations that, among other things, the Jig Grinder would be used by CNC WELD in Latvia, the United States Department of Commerce determined that no license was required to export the Jig Grinder to Latvia.

### COUNT ONE
(Conspiracy)

13. Paragraphs 1 to 12 are incorporated herein by reference.

14. From at least sometime in 2018, the exact date being unknown to the Grand Jury, and continuing thereafter until on or about the date of this Superseding Indictment, in the District of Connecticut and elsewhere, the defendants ███████████████, ROMANYUK, ANANICS, UZBALIS, MAMONOVS, ███████████████, ███████████████, ███, CNC WELD, and BY TRADE OU, together with others both known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree to commit offenses against the United States, that is,

   a. To willfully cause to be exported and reexported the Jig Grinder from the United States to Russia without first having obtained the required license or authorization from the United States Department of Commerce, in violation of Title 50, United States Code, Section 4819 and Title 15, Code of Federal Regulations, Sections 736.2 and 764.2;

   b. To knowingly export and send from the United States the Jig Grinder contrary to law and regulation of the United States, and to facilitate the transportation, concealment, and sale of the Jig Grinder, prior to exportation, knowing the same to be intended for exportation contrary to law and regulation, in violation of Title 18, United States Code, Section 554; and

c. To defraud the United States Department of Commerce by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export and supply of goods from the United States to restricted parties and foreign destinations without a license or authorization, by deceit, craft, trickery, and dishonest means.

### Objects of the Conspiracy

15. The objects and purpose of the conspiracy was for the defendants and others known and unknown to the Grand Jury:

   a. To cause others to export and reexport, and aid, abet, counsel, command, and induce the export and reexport, from the United States to Russia of the Jig Grinder, a dual-use item controlled on the CCL, without first having obtained a license or authorization from the United States Department of Commerce to do so, as required by the ECRA and the EAR;

   b. To obtain the Jig Grinder, a dual-use export-controlled item that could be used for nuclear proliferation in Russia, by filing and causing the filing of false documents with the United States Department of Commerce; and

   c. To enrich members of the conspiracy through, among other things, the procurement of the Jig Grinder, a dual-use export-controlled item, for Company B in Russia.

### Manner and Means of the Conspiracy

16. The manner and means by which the defendants and others known and unknown to the Grand Jury sought to accomplish and did accomplish the objects and purposes of the conspiracy included the following:

a. It was part of the scheme that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ sent electronic communications to Russian companies offering ▇ company ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ as a conduit for obtaining commodities that were restricted and controlled for export to Russia ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇;

b. It was further part of the scheme that Company B, a Russian company known to the Grand Jury, contracted with BY TRADE OU, who in turn, contracted ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ to obtain the Jig Grinder, a dual-use export-controlled item, from the United States to be transported to Latvia and then Estonia and finally to Russia, on Company B's behalf;

c. It was further part of the scheme that Company B provided funds for the purchase of the Jig Grinder by wire-transferring funds first to BY TRADE OU, which then wire-transferred funds to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

d. It was further part of the scheme that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ paid a Latvian company, CNC WELD, to act as the purported purchaser of the Jig Grinder, with ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ financing the purchase;

e. It was further part of the scheme that after MAMONOVS declared to the United States Department of Commerce that the Jig Grinder would not be reexported from Latvia, representatives of CNC WELD and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ travelled to the District of Connecticut to finalize the purchase of the Jig Grinder;

8

f. It was further part of the scheme that once the Jig Grinder was shipped from the United States to Latvia, CNC WELD canceled the purchase contract and directed its rights to the item to ▓▓▓▓▓▓▓▓▓▓▓▓;

g. It was further part of the scheme that ▓▓▓▓▓▓▓▓▓▓▓▓ attempted to reexport the Jig Grinder from Latvia to Russia without having obtained the required license or authorization from the United States Department of Commerce;

h. It was further part of the scheme that once an investigation was commenced by Latvian authorities into the reexport of the Jig Grinder, ANANICS, UZBALIS, and MAMONOVS provided false statements to Latvian authorities; and

i. It was further part of the scheme that once knowledge of a United States investigation into the smuggling of the Jig Grinder had been initiated and requests for interviews in Latvia and Estonia had been made through Mutual Lateral Assistance Treaty requests, ANANICS, UZBALIS, and MAMONOVS made false statements to Latvian law enforcement authorities and ROMANYUK made and caused another to make false statements to law enforcement authorities in Estonia, including false statements about the reasons the Jig Grinder was purchased, Company B's identity as the end user of the Jig Grinder, and the roles of the co-conspirators in the conspiracy.

## Overt Acts

17. In furtherance of the conspiracy and in order to effect the objects thereof, the defendants ▓▓▓▓▓▓▓▓▓▓▓▓, ROMANYUK, ANANICS, UZBALIS, MAMONOVS, ▓▓▓▓▓▓▓▓▓▓▓▓, CNC WELD, and BY TRADE OU,

and their co-conspirators, did commit, among others, the following overt acts in the District of Connecticut and elsewhere:

a. On or about November 21, 2018, a Russia-based company controlled by ▓▓▓ and known to the Grand Jury, wire transferred € 3,200.00 (approximately USD $3,458) from a Russian bank account to CNC WELD with the memorandum "Advance Payment for the Invoice."

b. On or about April 11, 2019, BY TRADE OU sold a Jig Grinder to Company B, a Russian company known to the Grand Jury, for € 1,400,000 (approximately USD $1,548,292). The Jig Grinder BY TRADE OU was selling was the same Jig Grinder that CNC WELD contemporaneously had initiated the purchase of from Company A, an American company to the Grand Jury.

c. On or about April 18, 2019, Company B made a payment of € 710,000 (approximately USD $767,332) from a Russian bank account to BY TRADE OU bank account XXXXXXXXXXXXXXXX7227 as the first agreed-upon payment in the contract for the sale/purchase of the Jig Grinder.

d. On or about April 26, 2019, MAMONOVS, as Director of CNC WELD, signed letters that were to be submitted to the United States Department of Commerce stating that the ultimate destination for the Jig Grinder was Riga, Latvia and that the Jig Grinder would not be resold.

e. On or about May 24, 2019 and May 29, 2019, Company A and ▓▓▓ signed a contract for the sale of the Jig Grinder for a price of USD $815,616. Among other things, the contract provided that for export-controlled items

10

Company A "will submit the export license application to the US Department of Commerce on behalf of the end user and will use [its] best efforts to assist in securing such a license for the end user."

f. On or about June 7, 2019, ▮▮▮▮▮▮▮▮▮▮▮▮ telephoned a representative of Company A asking for Company A's bank information for the initial wire transfer of the Jig Grinder purchase price.

g. On or about June 18, 2019, Company A submitted a license application to the United States Department of Commerce for the export of the Jig Grinder to Latvia. Included in the application were letters addressed to the United States Department of Commerce signed by MAMONOVS as Director of CNC WELD. In these letters, MAMONOVS represented that CNC WELD in Latvia was the end user of the Jig Grinder and that it would not sell or reexport the Jig Grinder to another country without the prior written authorization of the United States Department of Commerce.

h. Between on or about June 10, 2019 and on or about November 7, 2019, ▮▮▮▮▮▮▮▮▮▮▮▮ initiated four wire transfers to Company A for the purchase of the Jig Grinder for a total of 95% of the purchase price: (1) € 222,441.00 (approximately USD $248,221) on or about June 10, 2019; (2) € 300,000.00 (approximately USD $326,820) on or about September 12, 2019; (3) € 144,882.00 (approximately USD $157,457) on or about September 16, 2019; and (4) € 37,073.45 (approximately USD $39,731) on or about November 7, 2019.

i. On or about July 22, 2019, BY TRADE OU contracted with ▮▮▮▮▮▮▮▮▮▮▮▮ to purchase the Jig Grinder for € 1,238,200 (approximately USD $1,338,184).

11

j. Between in or around July 2019 and in or around October 2019, BY TRADE OU initiated five wire transfer payments totaling € 1,238,200 (approximately USD $1,338,184) to ▮▮▮▮▮▮▮▮▮▮ for the Jig Grinder.

k. On or about August 30, 2019, a representative of ▮▮▮▮▮▮▮▮▮▮ and ANANICS, as a representative of CNC WELD, signed a final acceptance contract with Company A for the purchase of the Jig Grinder.

l. On or about September 24, 2019, Company A shipped the Jig Grinder to CNC WELD in Riga, Latvia.

m. On or about November 1, 2019, UZBALIS submitted to Latvian authorities false technical specifications for the Jig Grinder that contained a false signature of a Company A representative.

n. On or about December 6, 2019, MAMONOVS, on behalf of CNC WELD, transmitted an electronic communication to Company A with a letter MAMONOVS had signed on December 4, 2019, stating that CNC WELD was unable to proceed with the purchase of the Jig Grinder because the Jig Grinder could not fit in CNC WELD's plant and that CNC WELD therefore was transferring its right to sell the Jig Grinder to ▮▮▮▮▮▮▮▮▮▮.

o. On or about December 6, 2019, ▮▮▮▮▮▮▮▮▮▮ submitted a request to Latvian customs seeking to reexport the Jig Grinder to Estonia.

p. On or about August 31, 2020, ANANICS told Latvian authorities that CNC WELD purchased the Jig Grinder to manufacture components for medical use.

12

q. On or about September 8, 2021, ROMANYUK caused another person to inform foreign authorities known to the Grand Jury that ROMANYUK was a contractor for BY TRADE OU who was facilitating a Russian University's purchase of the Jig Grinder.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
(Violation of Export Control Reform Act)

18. Paragraphs 1 to 12 and 14 to 17 above are incorporated herein by reference.

19. On or about September 24, 2019, in the District of Connecticut and elsewhere, the defendants ▮▮▮▮▮, ROMANYUK, ANANICS, UZBALIS, MAMONOVS, ▮▮▮▮▮, CNC WELD, and BY TRADE OU, aided and abetted by each other and by others known and unknown to the Grand Jury, did willfully export and cause the export of the Jig Grinder from the United States, knowing the Jig Grinder would be reexported to an end user in Russia, without first having obtained the required license or authorization from the United States Department of Commerce.

All in violation of Title 50, United States Code, Section 4819; Title 15, Code of Federal Regulations, Sections 736.2 and 764.2; and Title 18, United States Code, Section 2.

## COUNT THREE
(Smuggling Goods from the United States)

20. Paragraphs 1 to 12 and 14 to 17 above are incorporated herein by reference.

21. On or about September 24, 2019, in the District of Connecticut and elsewhere, the defendants ▮▮▮▮▮, ROMANYUK, ANANICS, UZBALIS, MAMONOVS, ▮▮▮▮▮, CNC WELD, and BY TRADE OU, together with others known and unknown to the Grand Jury, did willfully and knowingly export

and send from the United States, and attempt to export and send from the United States, a Jig Grinder, contrary to law and regulation of the United States, specifically, Title 50, United States Code, Section 4819 and Title 15, Code of Federal Regulations, Sections 736.2 and 764.2, and did facilitate the transportation, concealment, and sale of said Jig Grinder, prior to exportation, acting willfully and knowing the same to be intended for exportation contrary to law and regulation of the United States, specifically, Title 50, United States Code, Section 4819 and Title 15, Code of Federal Regulations, Sections 736.2 and 764.2.

All in violation of Title 18, United States Code, Sections 554 and 2.

## COUNT FOUR
(International Money Laundering Conspiracy)

22. Paragraphs 1 to 12 and 14 to 17 above are incorporated herein by reference.

23. From on or about November 21, 2018 through on or about November 7, 2019, the exact dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, the defendants ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, ROMANYUK, ANANICS, UZBALIS, MAMONOVS, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ CNC WELD and BY TRADE OU, together with others known and unknown to the Grand Jury, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States, in violation of Title 18, United States Code, Section 1956, to wit:

   a. To transport, transmit, and transfer and attempt to transport, transmit, and transfer a monetary instrument and funds to a place in the United States to and through a place outside the United States with the intent to promote the carrying on of specified

14

unlawful activity, that is, smuggling goods from the United States, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

b. To knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, smuggling goods from the United States, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

### Manner and Means

24. The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

a. ▬▬▬▬▬▬ paid CNC WELD to purchase a Jig Grinder and its directors, ANANICS and MAMONOVS, falsely claimed that they would not reexport the Jig Grinder from Latvia;

b. ▬▬▬▬▬▬ and ROMANYUK used ▬▬▬▬▬▬ and BY TRADE OU to receive monetary instruments and funds from Company B;

c. ▬▬▬▬▬▬ and ROMANYUK used ▬▬▬▬▬▬'s and BY TRADE OU's bank accounts in Europe to transfer monetary instruments and

funds to a bank account in the United States to pay for the Jig Grinder to conceal the source, ownership, and location of the purchase monies; and

d. UZBALIS agreed to file false specifications for the Jig Grinder with Latvian authorities in order to fraudulently cause authorities in Latvia to grant permission to export the Jig Grinder from Latvia.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT FIVE
(False Statements)

25. Paragraphs 1 to 12 and 14 to 17 above are incorporated herein by reference.

26. On or about June 18, 2019, in the District of Connecticut and elsewhere, the defendant ERIKS MAMONOVS did willfully and knowingly make and use a false writing and document, knowing the same to contain a materially false, fictitious, and fraudulent statement and entry in a matter within the jurisdiction of the United States Department of Commerce, by creating a document to be filed with the United States Department of Commerce, at Bridgeport, Connecticut, in the District of Connecticut, stating that CNC WELD would be the end user of the Jig Grinder and that the Jig Grinder would not be exported from Latvia, well knowing and believing that CNC WELD would not be the end user of the Jig Grinder and that the Jig Grinder would be exported from Latvia.

All in violation of Title 18, United States Code, Sections 1001(a)(3) and 2.

## FORFEITURE ALLEGATION
(Export and Smuggling Offenses)

27. Upon conviction of any of the offenses alleged in Count Two and Count Three of this Superseding Indictment, the defendants ███████████████, ROMANYUK, ANANICS, UZBALIS, MAMONOVS, ███████████, ███████████████, CNC WELD, and BY TRADE OU shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to the said offense, including but not limited to an interest up to the amount of € 340,000 in Nextpay Account No. LTxxxxxxxxxxxxxxx1211, held in the name of BY TRADE OU.

28. If any of the above-described forfeitable property, as a result of any act or omission of the defendants, cannot be located upon the exercise of due diligence, has been transferred, sold to or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value or has been commingled with other property that cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

All in accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853; Title 28, United States Code, Section 2461(c); and Rule 32.2(a) of the Federal Rules of Criminal Procedure.

## FORFEITURE ALLEGATION
(Money Laundering Offense)

29. Upon conviction of the money laundering offense alleged in Count Four of this Superseding Indictment, the defendants ████████, ROMANYUK, ANANICS, UZBALIS, MAMONOVS, ████████, CNC WELD, and BY TRADE OU shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), all right, title, and interest in any and all money and other property involved in the offense, in violation of Title 18, United States Code, Section 1956(h), and all property traceable to such property, including but not limited to an interest up to the amount of € 340,000 in Nextpay Account No. LTxxxxxxxxxxxxxxx1211, held in the name of BY TRADE OU.

30. If any of the above-described forfeitable property, as a result of any act or omission of the defendants, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

All in accordance with Title 18, United States Code, Section 982(a)(1); Title 21, United States Code, Section 853; and Rule 32.2(a) of the Federal Rules of Criminal Procedure.

A TRUE BILL 

FOREPERSON

UNITED STATES OF AMERICA

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

RAHUL KALE
ASSISTANT UNITED STATES ATTORNEY

KONSTANTIN LANTSMAN
ASSISTANT UNITED STATES ATTORNEY

MATTHEW ANZALDI
TRIAL ATTORNEY – DOJ NATIONAL SECURITY DIVISION

19